MilligAN, J.,
delivered tbe opinion of tbe court:
Tbis case arises on a charter-party entered into on tbe 19th day of November, 1862, by and between H. E. Borckner, agent of D. D. Leary, owner of tbe steamboat Mattano, (then lying in tbe harbor of Port Boyal, South Carolina,) and Captain C. E. *239 Fuller, assistant quartermaster in the United States Army. The original petition stands in the name of Daniel D. Leary, Arthur Leary, and George Leary; the latter two of whom, as alleged in the amended and supplemental petitions, were at the date of the charter-party, and ever since, joint and equal owners of the steamer with the petitioner, D. D. Leary ; and judgment is therefore sought for the equal benefit of all.
The vessel went into the service of the United States on the day on which the charter-party bears date, and she has been paid at the chartered rates — $250 per day up to the 3d of May, 1803.
The claim, as set forth in the petition, is rested on the injuries which resulted to the vessel while moving, under the orders of the quartermaster, at Port Eoyal, expenses of repairs, loss of wages, &c.
The damages claimed may be more specifically set out as follows:
Costs and charges for repairs... $19,847 15
Expenses of master, mate, engineer, and crew.... 2,790 00
Seduction in value of vessel. 20,000 00
Loss of earnings from May 12 to December 10,1863.. 53,000 00
95,637 15
The facts necessary to a decision of this case are found to be:
On the 19th of November, 1862, a charter-party was regularly entered into between the claimant, D. D. Leary, and C. E. Fuller, quartermaster in the United States Army, which contains the ordinary stipulations found in similar charters of affreightment, except as hereinafter shown. The vessel was to be kept by the party of the first part “ tight, stanch, well-fitted, tackled, and provided with every requisite, and with men and provisions necessary,” and to be at the sole use and disposal of the party of the second part during the existence of the charter, for which she was to receive $250 per day while she was retained under the charter.
Added to these ordinary stipulations, it was further agreed : “In case said vessel, while executing the order of said party of the second part, should be destroyed or damaged by a hostile force from any quarter, or by being compelled by the party *240 of tbe second part to run any extraordinary marine risk, then the party of the first part is to be indemnified; that is to say, in case of loss, her yalue is fixed at $26,000; and in case of damage, the amount is to be ascertained by a board of survey, which shall be convened on her arrival at Port Royal, South Carolina, or other friendly port, at the expense of the said party of the second part.”
The vessel went into the service of the United States on the day of the date of the charter-party, and shortly before the disaster complained of she had come up from Fort Pulaski to Port Royal for commissary stores, and had been lying in the harbor for two days in a gale of wind. The waters were perfectly familiar to the captain, and on the 12th of May, 1863, the acting harbor-master ordered the Mattano to make room for the General Hunter. The captain objected to going out,' as the tide was very low, and a considerable breeze blowing from the north-northwest. To this objection the harbor-master replied, “he had been there too long not to obey orders; that he knew the General Hunter must have the berth, and to back out.” In executing this order the vessel struck on a sunken mooring-anchor, a short distance from where she was lying in the harbor. There was no unskillfulness in managing the boat. The captain says: “ I knew there was an anchor somewhere there, but I supposed we were a long way outside of it. When I first went to Port Royal this anchor had a buoy attached, but it got adrift, and there was nothing at that time to indicate where the anchor was, and there had not been for a long time. I had no idea that the anchor was where it-was, and I supposed when the boat struck it had struck a wreck. The anchor was deeply imbedded in the sand, and the fluke ran through the bottom of the boat. She filled and went down in fifteen minutes.”
It is further shown that the anchor had been placed there by order of Captain Saxton, quartermaster, to moor the large ocean steamers to, and the winds and tides had carried off the buoy that marked its locality.
At the time the accident occurred the tide was low, but the wind was blowing very little.
. Soon after the wreck the captain and crew on board abandoned the vessel, and refused to have anything more to do •with her.
*241 Captain Moore, the acting quartermaster, immediately thereafter sent the Derigo, a wrecking steamer in the service of the government, to raise her. , After two days’ unsuccessful effort, she was ordered off, having injured the cabin and hull of the Mattaho in attempts to raise her.’ Soon after, Captain Bennett was sent there by the United States quartermaster, who succeeded in lifting the wreck, at a cost of $12,000 to the government. He floated her into quiet water and made slight repairs on her hull, and afterward she was taken to Beaufort, and there temporarily repaired by her owners, and thence to Brooklyn navy yard, where she was converted into a tug-boat, and afterward as such again placed in the service of the United States, at $100 per day, under a new charter-party dated the 2d of May, 1864.
There is no evidence that any part of the claim set up in the petition has ever been paid, or even presented to the proper department for payment. The wreck occurred on the 12th of May, 1863, and the repairs on the boat were completed on the 10th of December, 1863.
The question, under the facts of this case, presented for decision, is confined to very narrow limits. The whole case turns on the construction to be given to the clause in the charter-party providing for indemnity, in case the vessel is compelled to run “any extraordinary marine risk.” What does this phrase mean? Are we to give it a technical interpretation, or such as its plain language imports? Certainly, the latter is the rule. The charter is the law of the case, and the light in which it was understood by the contracting parties is always the true rule of its, interpretation. The charter-party declares that the vessel was chartered, “ for the purpose of plying in the harbor of Port Boyal, South Carolina, or any other service that the party of the second part may designate.” But if the vessel, while executing the orders of the party of the second part, should be destroyed or damaged by a hostile force from any quarter, or by being compelled by the party of the second part to run any extraordinary marine risk, then the party of the first part shall be indemnified.
It cannot, we think, be doubted, that the risk against which the government undertook to indemnify the owners, was a risk extraordinary in hind, and not in degree. The vessel was to be employed in the waters of Port Boyal, where she would be *242 comparatively safe from the extraordinary perils of the sea, and the dangers of the war. But if she were ordered into any other service, in which extraordinary marine risk was inherent and inseparable from the service, such, for instance, as among the Florida reefs, or in southern and blockaded rivers, or exposed to rebel batteries, the United States were bound to indemnify the owners for any damage or loss the vessel might sustain while executing these orders in such, dangerous navigation.
' The exposure to which she was subjected by the order of the harbor-master, to back out of her berth in the harbor of Port Boyal, involved no such extraordinary marine risk as is contemplated in the charter. There is no evidence to convince us that the state of the tide or the condition of the wind presented any serious obstacle to the execution of the order. The anchor on which the vessel was wrecked was the only difficulty, and its existence was as well known to the captain as to the harbormaster. It might have been negligence in the quartermaster in suffering it to remain in the harbor without a buoy to mark its locality, but the government is not liable for the negligence or misfeasance of its officers ■, nor would it have excused the underwriters from liability on an ordinary marine policy.
The disaster was a usual marine disaster, which is covered by ordinary marine x>olieies of insurance, and not such extraordinary marine risk as is contenrplated by the charter-xmrty; and if the owners neglected to x>rotect themselves against such perils, by insurance, the law makes them their own insurers, and they must bear the loss. They cannot east their own negligence on the shoulders of the government, and comx>el it to bear losses it never assumed.
The petition must be dismissed.